# United States District Court
## EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| DUSTIN ALEXANDER, | § | |
| | § | |
| *Plaintiff,* | § | |
| v. | § | Civil Action No. 4:24-cv-93 |
| | § | Judge Mazzant |
| EXPERIAN INFORMATION | § | |
| SOLUTIONS, INC., | § | |
| | § | |
| *Defendant.* | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court is Defendant Experian Information Solutions, Inc.'s Motion to Compel Arbitration and Memorandum of Law (Dkt. #13). Also pending before the Court is Defendant's Opposed Motion for a Stay of Discovery Pending Resolution of Motion to Compel Arbitration or, in the Alternative, for a Protective Order (Dkt. #14). Having considered both Motions, the relevant pleadings, and the applicable law, the Court determines as follows:

1. Defendant's Motion to Compel Arbitration (Dkt. #13) should be **GRANTED**.
2. Defendant's Motion for a Stay of Discovery (Dkt. #14) should be **DENIED as moot**.

Accordingly, this civil action should be **STAYED** until the resolution of arbitration proceedings.

## BACKGROUND

This is a Fair Credit Reporting Act ("FCRA") case. The issue at hand is a threshold one which has nothing to do with the FCRA. That is, whether the underlying dispute should be arbitrated. It should. But before explaining why, the Court recounts the facts surrounding the underlying dispute and summarizes the relevant procedural posture of the case.

## I.    Factual Background

Plaintiff Dustin Alexander has filed this suit against Experian Information Solutions, Inc. ("EIS" or "Defendant"), alleging that EIS failed to comply with the FCRA because, according to Plaintiff, Defendant "falsely or erroneously published multiple accounts not opened or authorized . . . to Plaintiff's Experian consumer [credit] report," which Defendant did not correct (Dkt. #1 at p. 2). As a result, Plaintiff claims to have suffered "damage by loss of credit, loss of ability to purchase and benefit from credit, lost earnest money, and . . . mental and emotional pain, anguish, humiliation, and embarrassment of credit denial" (Dkt. #1 at pp. 7, 9–10, 12).

As relevant here, EIS's affiliate, "Consumerinfo.com, Inc.," doing business as Experian Consumer Services ("ECS"), offers a service called "CreditWorks" (Dkt. #13 at p. 4). Plaintiff does not appear to meaningfully dispute that ECS is an affiliate of EIS (Dkt. #13 at p. 3; *see* Dkt. #16). CreditWorks is ECS's credit monitoring service, which allows its members to access their consumer credit reports (Dkt. #13 at p. 4; Dkt. #13-1 at p. 4).

On June 15, 2023, Plaintiff enrolled in CreditWorks (Dkt. #16-1 at p. 1; Dkt. #13 at pp. 3–4). Plaintiff did so by completing a webform on ECS's website (Dkt. #13 at p. 4). That webform required Plaintiff to enter personal information, such as Plaintiff's name, address, phone number, and e-mail address (Dkt. #13 at p. 5). To complete enrollment, ECS's website required Plaintiff to click an icon, which said "Create Your Account" (Dkt. #13 at p. 6).

Between the "Create Your Account" button and the entry fields for a user's email address and password, the following admonishment appeared: "By clicking 'Create Your Account': I accept and agree to your Terms of Use Agreement, as well as acknowledge receipt of your Privacy Policy" (Dkt. #13 at p. 6; Dkt. #13-1 at p. 2, 8). The Terms of Use Agreement ("Terms of Use") appeared as a hyperlink, offset and in bold, blue text, which, if and when pressed, would have

presented a user with the full Terms of Use (Dkt. #13 at p. 6). All of this is undisputed (*See* Dkt. #16). Critically, it is also undisputed that Plaintiff clicked the "Create Your Account" button (Dkt. #13 at p. 6; *see* Dkt. #16; Dkt. #16-1 at p. 1 ("I made an account on Experian's website.")).

The Terms of Use includes a section entitled "Dispute Resolution by Binding Arbitration" (the "Arbitration Provision") (Dkt. #13-1 at p. 16).[1] In relevant part, it states that the parties "agree to arbitrate all disputes and claims between [them] that arise out of or relate to this agreement, which includes any information you obtain through the Services and Websites, to the maximum extent permitted by law" (Dkt. #13-1 at p. 17; Dkt. #13-1 at p. 68). The Arbitration Provision further states that it is meant to be "broadly interpreted" and "includes, but is not limited to, claims brought by you against [Defendant], whether based in contract, tort, statute (including, without limitation, the Fair Credit Reporting Act and the Credit Repair Organizations Act), for fraud, misrepresentation or any other legal theory" (Dkt. #13-1 at p. 18; Dkt. #13-1 at p. 69). The Arbitration Provision delegates all issues to be decided by the arbitrator including: "(i) all issues regarding arbitrability, (ii) the scope and enforceability of this arbitration provision . . . [or] [(iii)] whether all or any part of this arbitration provision or Agreement is unenforceable, void or

---

[1] Defendant submitted the Terms of Use agreement that was in effect when Plaintiff enrolled in CreditWorks and the Terms of Use agreement that was in effect when Plaintiff filed suit as exhibits to the Declaration Defendant offered in support of its Motion to Compel (Dkt. #13-1 at p. 4; Dkt. #13-1 at pp. 10–60; Dkt. #13-1 at pp. 61–108). Every iteration of the Terms of Use that was in effect while Plaintiff used CreditWorks included an arbitration provision substantially comparable to that when he enrolled in CreditWorks (Dkt. #13-1 at p. 4). Neither party mounts an argument for or against arbitration based on any amendment to Terms of Use. Further, "[e]very version of the Terms of Use Agreement in effect during Plaintiff's enrollment has a section entitled 'Amendments,' which advised him that he would be bound by the then-current Terms of Use each time he 'ordered, accessed, or used' any Services or Websites described in the agreement" (Dkt. #13-1 at p. 5). It is undisputed that Plaintiff continuously used such services leading up to this lawsuit (Dkt. #13-1 at p. 4; *see* Dkt. #16). Plaintiff does not dispute any of these terms, nor does he appear to dispute their consequences—except that they require arbitration of his claims (*See* Dkt. #16).

voidable including, but not limited to, on grounds of unconscionability. . ." (Dkt. #13-1 at p. 19). Despite all of this, Plaintiff now seeks to pursue his claim in federal court.

## II.    Procedural Background

Plaintiff filed suit on February 1, 2024, asserting FCRA claims under 15 U.S.C. § 1681 (Dkt. #1). On August 7, 2024, Defendant filed its Motion to Compel Arbitration and Memorandum of Law, which was deficient (Dkt. #12). That same day, Defendant filed its Corrected Motion to Compel, which is now before the Court (Dkt. #13). Through it, Defendant asks the Court to enforce the arbitration clause in the Terms of Use and to compel arbitration pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 3–4 (Dkt. #13 at p. 1). Defendant asserts that Plaintiff agreed to the Terms of Use by creating a CreditWorks account and therefore must arbitrate the allegations that form the basis of this lawsuit (Dkt. #13 at pp. 9–11). Almost two weeks after filing its Motion, Defendant filed its Opposed Motion for a Stay of Discovery asking the Court to stay discovery until its Motion to Compel is decided (Dkt. #14). Plaintiff never responded to Defendant's Motion to Stay. But the next day, Plaintiff filed his Response in Opposition to Defendant's Motion to Compel (Dkt. #16). On August 27, 2024, Defendant replied to Plaintiff's Response resisting arbitration (Dkt. #18). Separately, Defendant submitted two notices of supplemental authority in support of its Motion to Compel (Dkt. #17; Dkt. #21).

## LEGAL STANDARD

Under the Federal Arbitration Act ("FAA"), "parties to a contract may agree that an arbitrator rather than a court will resolve disputes arising out of the contract." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 65 (2019). The FAA provides that written agreements to arbitrate controversies arising out of an existing contract "shall be valid, irrevocable, and

enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "The FAA was designed to overrule the judiciary's long-standing refusal to enforce agreements to arbitrate and to place such agreements upon the same footing as other contracts." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989) (internal quotations omitted). Thus, the FAA establishes "'a liberal federal policy favoring arbitration agreements.'" *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). Because arbitration is a creature of contract, the FAA "requires courts to enforce agreements to arbitrate according to their terms." *CompuCredit Corp.*, 565 U.S. at 98 (citing *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985)).

Although there is a strong federal policy favoring arbitration, the policy "does not apply to the determination of whether there is a valid agreement to arbitrate between the parties." *Lloyd's Syndicate 457 v. FloaTEC, L.L.C.*, 921 F.3d 508, 516 n.5 (5th Cir. 2019) (quoting *Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 214 (5th Cir. 2003)). The FAA "does not require parties to arbitrate when they have not agreed to do so." *Volt*, 489 U.S. at 478 (citing *Byrd*, 470 U.S. at 219). Rather, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960). The FAA "simply requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms." *Volt*, 489 U.S. at 478 (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967))

When considering a motion to compel arbitration, courts apply a two-step framework. First, the Court must determine "whether the parties entered into any arbitration agreement at all."

*Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 201 (5th Cir. 2016). "This first step is a question of contract formation only—did the parties form a valid agreement to arbitrate some set of claims." *IQ Prods. Co. v. WD-40 Co.*, 871 F.3d 344, 348 (5th Cir. 2017), *cert. denied*, 584 U.S. 1031 (2018). This initial question is for the Court. *Kubala*, 830 F.3d at 201. To determine whether there is a valid agreement to arbitrate, courts "'apply ordinary state-law principles that govern the formation of contracts.'" *Webb v. Investacorp, Inc.*, 89 F.3d 252, 258 (5th Cir. 1996) (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 939 (1995)). Under Texas law, a binding contract requires: "'(1) an offer; (2) an acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract with intent that it be mutual and binding.'" *In re Capco Energy, Inc.*, 669 F.3d 274, 279–80 (5th Cir. 2012) (quoting *Coffel v. Stryker Corp.*, 284 F.3d 625, 640 n.17 (5th Cir. 2002)).

If the Court finds that there is a valid agreement to arbitrate, it proceeds to the second question: whether the claim at issue is covered by the arbitration agreement. *IQ Prods.*, 871 F.3d at 348. In the second step, the Court must determine "'whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims.'" *Webb*, 89 F.3d at 258 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985)). This second question usually is for the Court, unless the arbitration clause contains a valid delegation clause for an arbitrator to determine whether the claim falls within the arbitration agreement. *Kubala*, 830 F.3d at 201–02.

The party seeking to compel arbitration must prove the existence of an agreement to arbitrate by a preponderance of the evidence. *Grant v. Houser*, 469 F. App'x 310, 315 (5th Cir. 2012). Once the Court determines that there is a valid agreement to arbitrate, the strong federal policy

favoring the enforcement of the arbitration agreements applies, and all ambiguities must be resolved in favor of arbitration. *Banc One Acceptance Corp. v. Hill*, 367 F.3d 426, 429 (5th Cir. 2004) (citing *Primerica Life Ins. Co. v. Brown*, 304 F.3d 469, 471 (5th Cir. 2002)). As the Supreme Court has stated: "'An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.'" *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) (quoting *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582–83 (1960)). Because of the strong presumption in favor of arbitration, the party opposing arbitration bears the burden to demonstrate either that the agreement is invalid or that the claims are outside of the agreement's scope. *See Carter v. Countrywide Credit Indus., Inc.*, 362 F.3d 294, 297 (5th Cir. 2004).

## ANALYSIS

The instant dispute hinges on the validity and applicability of the Arbitration Provision contained in the Terms of Use. The Court's analysis focuses only on two questions: "(1) is there a valid agreement to arbitrate the claims; and (2) does the dispute in question fall within the scope of that arbitration agreement." *See Sherer v. Green Tree Servicing LLC*, 548 F.3d 379, 381 (5th Cir. 2008). First, the Court will apply ordinary state law to determine "whether the parties entered into *any arbitration agreement at all*." *See Kubala*, 830 F.3d at 201. Then the Court assesses the question of arbitrability. *See IQ Prods.*, 871 F.3d at 348.

Here, Defendant insists that the Arbitration Provision is binding under Texas law (Dkt. #13). Plaintiff disagrees. Plaintiff asserts that the parties never shared a meeting of the minds, and that Defendant cannot compel arbitration because it is not a signatory to the Terms of Use (Dkt.

#16 at p. 3). Therefore, according to Plaintiff, the Terms of Use are invalid, and no enforceable arbitration agreement exists (Dkt. #16 at p. 3). In the alternative, even if the Terms of Use and Arbitration Provision are binding, Plaintiff argues that his claims are outside the scope of the Arbitration Provision because his claim does not directly relate to the protected services (Dkt. #16 at p. 5). The Court agrees with Defendant that the Arbitration Provision contained in the Terms of Use constitutes a valid contract under Texas law. The Court also agrees with Defendant that, under the contract language, questions of arbitrability are delegated to an arbitrator. Finally, it is clear under the Terms of Use and Arbitration Provision that Defendant may request that the Court compel arbitration because it is a party to the agreement. The Court begins by establishing that the parties executed a valid arbitration agreement, which Defendant may enforce. Then, the Court explains why the arbitrability of Plaintiff's claims is reserved for the arbitrator.

## I.    The Arbitration Agreement

The first question for the Court is whether there is "any arbitration agreement at all." *See Kubala*, 830 F.3d at 201. The parties agree that Texas law governs the enforceability of the Arbitration Provision (*See* Dkt. #13; Dkt. #16 at p. 2). The parties diverge, however, on its enforceability. Predictably, Defendant contends that Plaintiff has agreed to arbitrate his claims because he accepted the Terms of Use, which contain the Arbitration Provision, when he created his CreditWorks account (*See* Dkt. #13 at pp. 10–11). Plaintiff disagrees. To Plaintiff, the Arbitration Provision is not enforceable because Plaintiff "did not even know he was subscribing to [Defendant's] CreditWorks service" and did not intend to enroll in that service (Dkt. #16 at p. 3). As explained below, Plaintiff is wrong. A valid arbitration agreement exists, and it binds Plaintiff.

Under Texas law, a binding contract requires: "(1) an offer; (2) an acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) each party's consent to the

terms; and (5) execution and delivery of the contract with intent that it be mutual and binding." *In re Capco Energy, Inc.*, 669 F.3d 274, 279–80 (5th Cir. 2012). Here, Plaintiff argues that the Arbitration Provision is unenforceable only because the third element is lacking—i.e., there is no meeting of the minds (*See* Dkt. #16).[2] Plaintiff does not appear to dispute the satisfaction of the remaining elements. And in the absence of any dispute as to the remaining elements, the Court need not fully analyze them here. No less, in the Court's view, they are satisfied.

To Plaintiff, because he did not know he was "subscribing to Experian's CreditWorks service," and did not intend to do so, there can be no meeting of the minds (Dkt. #16 at p. 3; *see* Dkt. #16-1 at p. 3). In support of that position, Plaintiff cites no authority. Instead, Plaintiff states, "he only learned about the existence of being enrolled in Experian's CreditWorks service after he brought this action" (Dkt. #16 at p. 3). Defendant sees it differently. According to Defendant, courts in the Fifth Circuit applying Texas law generally enforce internet contracts that contain arbitration clauses when the user to be bound has constructive notice of the agreement, affirmatively accepts the agreement via a click of a button, and yet simply declines to read it (*See* Dkt. #18 at p. 3) (collecting cases). Defendant is correct.

---

[2] In a single sentence, bereft of any evidence or authority, Plaintiff asserts that Defendant's "arbitration agreement is not valid and enforceable because it is against public policy to enforce any agreement entered into by means of deceit and fraud" (Dkt. #16 at p. 3). True, the law does not enforce such agreements. *See generally Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*, 960 S.W.2d 41, 46 (Tex. 1998) ("As a rule, a party is not bound by a contract procured by fraud."). But the party seeking contract avoidance carries the burden to prove fraud. *Tex. Black Iron, Inc. v. Arawak Energy Int'l Ltd.*, 566 S.W.3d 801, 819 (Tex. App.—Houston [14th Dist.] 2018, pet. denied). A far cry from carrying his burden, Plaintiff has merely uttered the word "fraud" here. That will not suffice. Accordingly, the Court will not seriously entertain that argument.

Continuing the shotgun attempt to resist arbitration, Plaintiff's brief also references various Consumer Financial Protection Bureau ("CFPB") and Federal Trade Commission ("FTC") proceedings against Experian (*See* Dkt. #16 at pp. 3–4). Those proceedings are patently irrelevant here. But according to Plaintiff, the Court ought to consider those proceedings because, somehow, Defendant's attempt to bring Plaintiff to arbitration is "just Experian's most recent deceptive practice . . . ." (Dkt. #16 at p. 4). That unsubstantiated allegation carries no weight.

Though neither party squarely explains the landscape surrounding internet agreements of this variety, because that background informs the Court's decision, it is an appropriate starting point here. Generally, Texas law holds internet agreements enforceable. *See, e.g.*, *StubHub, Inc. v. Ball*, 676 S.W.3d 193, 199 (Tex. App.—Houston [14th Dist.] 2023, no pet.). Likewise, the enforceability of contracts executed online is measured against ordinary principles of contract law. *See, e.g.*, *id.* Under those principles, "to discern whether there was a meeting of the minds, we look in an 'objective fashion' for 'what the parties actually said and did.'" *Gray Law LLP v. Transcon. Ins. Co.*, 560 F.3d 361, 366 (5th Cir. 2009) (quoting *Choctaw Props., LLC v. Aledo ISD*, 127 S.W.3d 235, 245–46 (Tex. App.—Waco 2003, no pet.) ("[A] court reviews in an objective fashion what the parties actually said and did without consideration of subjective intent.")); *see also StubHub*, 676 S.W.3d at 199 ("Whether mutual assent exists as to a contract's subject matter and essential terms is an objective inquiry, turning on what the parties said and did, not their subjective states of mind."). "Parties may manifest their assent to an agreement not only by signing a written document but by conduct, provided they intend to engage in the conduct and know or have reason to know that the other party may infer assent from their conduct." *StubHub*, 676 S.W.3d at 199 (citing *BPX Operating Co. v. Strickhausen*, 629 S.W.3d 189, 202 (Tex. 2021)).

Generally, these fundamental tenets apply to online agreements just the same. *See One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 268 (5th Cir. 2011) "([W]hile new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract.") (citation omitted). Though, courts have recognized that different types of online agreements demand slightly different analyses. Three general types of

online agreements are of note.[3] The first is a "clickwrap" agreement. Clickwrap agreements "are generally defined by the requirement that users assent to contract terms by 'clicking' some sort of 'I agree' or 'accept' button on a website to complete the transaction." *StubHub*, 676 S.W.3d at 200; *see also Hotels.com, L.P. v. Canales*, 195 S.W.3d 147, 155 (Tex. App.—San Antonio 2006, no pet.) (defining clickwrap agreements similarly); *Ambit Mktg., LLC v. TLC Energy Grp., LLC*, No. 05-24-00009-CV, 2024 WL 4763273, at *2 n.3 (Tex. App.—Dallas Nov. 13, 2024, pet. filed) (same); *JLR Glob., LLC v. PayPal Holding Co.*, No. 4:22-CV-559, 2023 WL 2527158, at *4 (E.D. Tex. Mar. 15, 2023), *reconsideration denied*, No. 4:22-CV-559, 2024 WL 4198003 (E.D. Tex. Sept. 13, 2024). Such agreements are enforceable under Texas law. *StubHub*, 676 S.W.3d at 200; *RealPage, Inc. v. EPS, Inc.*, 560 F. Supp. 2d 539, 545 (E.D. Tex. 2007) (collecting case and stating that "Texas law recognizes the validity of clickwrap agreements"); *Bongalis-Royer v. RJ Worldwide, LLC*, No. 4:14-CV-330, 2015 WL 12778846, at *5 (E.D. Tex. July 16, 2015).

Another type of electronic agreement is a "browsewrap" agreement. *StubHub*, 676 S.W.3d at 200. A browsewrap agreement "typically involve[s] a situation where a notice on a website conditions use of the site upon compliance with certain terms or conditions, which may be included on the same page as the notice or accessible via a hyperlink." *Id.* at 200–01. Unlike clickwrap agreements, browsewrap agreements "do[ ] not require the user to manifest assent to the terms and conditions [of a website] expressly . . . ." *Id.* Instead of clicking an "I accept" or "I agree" button,

---

[3]  A fourth type of agreement, known as a "scrollwrap" contracts, "require a user to scroll through the full text of terms and conditions before clicking a button that states, 'I agree.'" *Walker v. Neutron Holdings, Inc.*, No. 1:19-CV-574-RP, 2020 WL 703268, at *3 n.2 (W.D. Tex. Feb. 11, 2020), *report and recommendation adopted*, No. 1:19-CV-574-RP, 2020 WL 4196847 (W.D. Tex. Apr. 8, 2020) (citing *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 394–95 (E.D.N.Y. 2015). Nothing in Defendant's Motion nor the Declaration submitted in support suggests that such an agreement is at issue here.

the user assents to the terms of a browsewrap agreement "simply by using the website." *Id.* Texas

law leaves the enforceability of browsewrap more open. That is, the enforceability of browsewrap

agreements turns on whether the user of the website had "'actual or constructive knowledge of a

site's terms and conditions prior to using the site.'" *Id.* (quoting *Phillips v. Neutron Holdings, Inc.*,

No. 3:18-CV-3382-S, 2019 WL 4861435, at *4 (N.D. Tex. Oct. 2, 2019)).

   The final species of internet agreement worthy of mention here is the "sign-in-wrap"

agreement. To some extent, a sign-in-wrap agreement is a hybrid form of a clickwrap and

browsewrap agreement. "A sign-in-wrap agreement notifies [website] users of the existence of the

website's terms and conditions and advises users that they are agreeing to the terms when

registering an account or signing in." *Id.* Under Texas law, whether a sign-in-wrap agreement is

enforceable "turns on whether notice of the terms and conditions was reasonable conspicuous."

*Id.* at 201 (citation omitted). Critically, whether the terms and conditions were reasonably

conspicuous is an objective question of law for the Court—not a question of fact. *See HomeAdvisor,*

*Inc. v. Waddell*, No. 05-19-00669-CV, 2020 WL 2988565, at *4 (Tex. App.—Dallas June 4, 2020,

no pet.) (citing *Littlefield v. Schafer*, 955 S.W.2d 272, 274 (Tex. 1997); *American Home Shield Corp.*

*v. Lahorgue*, 201 S.W.3d 181, 184 (Tex. App.—Dallas 2006, pet denied)); *see also Phillips v. Neutron*

*Holdings, Inc.*, No. 3:18-CV-3382-S, 2019 WL 4861435, at *4 (N.D. Tex. Oct. 2, 2019).

   Neither party attempts to categorize the type of agreement Defendant seeks to enforce. But

against this backdrop, it seems obvious that the Terms of Use constitute a sign-in-wrap agreement

of which the Arbitration Provision is a part. Certainly, Defendant's undisputed explanation of how

ECS's website functions and how a user might accept the Terms of Use is not comparable to a

clickwrap agreement—a user is not prompted to click any sort of "I accept," or "I agree," button

to complete a transaction. *See StubHub*, 676 S.W.3d at 200. The Agreement is even more dissimilar to a browsewrap agreement—a user of CreditWorks must still manifest their assent to the terms of the website. *See id.* at 200–01. Here, the Agreement appears to be a sign-in-wrap agreement. A CreditWorks user cannot subscribe to any of Experian's services without making an account (Dkt. #13-1 at p. 2). And by making an account, one expressly manifests their assent to the Terms of Use, which appear hyperlinked below (*See* Dkt. #13-1 at pp. 2, 8). Thus, the enforceability of the Arbitration Provision in the Terms of Use turns on whether a user would have had reasonable notice of them. *See Phillips*, 2019 WL 4861435, at *4 ("Courts typically enforce sign-in-wraps where the user had reasonable notice of the existence of the terms—i.e., whether the notice was 'reasonably conspicuous.'"); *Home Advisor*, 2020 WL 2988565, at *4; *StubHub*, 676 S.W.3d at 201; *Walker v. Neutron Holdings, Inc.*, No. 1:19-CV-574-RP, 2020 WL 703268, at *3 (W.D. Tex. Feb. 11, 2020), *report and recommendation adopted*, No. 1:19-CV-574-RP, 2020 WL 4196847 (W.D. Tex. Apr. 8, 2020). In making that determination, Texas "courts consider the perspective of a reasonably prudent smartphone user." *HomeAdvisor*, 2020 WL 2988565, at *4 (citing *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 73 (2d Cir. 2017)); *Walker*, 2020 WL 703268, at *3 (citing *Meyer*, 868 F.3d at 73) (applying Texas law); *Phillips*, 2019 WL 4861435, at *4 (citing *Meyer*, 868 F.3d at 77) (applying Texas law). Here, there can be no question. A reasonably prudent user would have had reasonable notice of the Terms of Use, a part of which is the Arbitration Provision.

Here, all the evidence suggests that the Terms of Use were highly conspicuous as they appeared on Experian's website. As Defendant's uncontroverted Declaration makes clear, Plaintiff is a member of CreditWorks (Dkt. #13-1 at pp. 3, 8). To become a member, Plaintiff had to enroll (Dkt. #13-1 at pp. 3, 8). To enroll, Plaintiff had to enter his name, phone number, and email address

on Experian's website (Dkt. #13-1 at p. 3). Then, he had to create a password for his account (Dkt. #13-1 at pp. 3, 8). Then, he had to click a "Create Your Account" button (Dkt. #13-1 at pp. 3, 8). Immediately below the fields in which Plaintiff input his personal information, and directly above the "Create Your Account" button, Defendant's website admonished, in relevant part: "By clicking 'Create Your Account': I accept and agree to your Terms of Use Agreement, as well as acknowledge receipt of your Privacy Policy" (Dkt. #13-1 at pp. 3, 8). Both the Terms of Use Agreement and the Privacy Policy were offset in bold, blue text (Dkt. #13-1 at p. 8). It could not be more conspicuous. Consequently, the sign-in wrap agreement on Defendant's webform would have given a reasonably prudent user reasonably conspicuous notice of Defendant's Terms of Use. By creating his account in the face of that notice, Plaintiff expressly manifested his assent to the Terms of Use and the Arbitration Provision. Objectively, therefore, the parties had a meeting of the minds.

This conclusion finds support in analogous caselaw. *HomeAdvisor* is an illustrative cognate. There, the defendant, a website operator, sought to enforce an arbitration provision that appeared in a sign-in-wrap agreement. 2020 WL 2988565, at *1. The plaintiff website users sought to avoid arbitration, arguing that the agreement was unenforceable primarily because it lacked mutual assent. *Id.* at *3. There, the plaintiffs had filled out a webform to procure the website operator's services, which required the plaintiffs to input their personal information into fields and click a "Submit Request" button below those fields. *Id.* at *2. Directly below that button, the webform displayed the following message: "By submitting this request, you are agreeing to our Terms & Conditions." *Id.* Those terms and conditions appeared in blue font as a hyperlink. *Id.* Those terms and conditions also included an arbitration clause. *Id.* Despite the plaintiff's efforts, the Dallas Court of Appeals concluded that plaintiffs had entered into a valid arbitration agreement. *Id.* at *4–

14

5. Heavily relying on the obvious nature of the hyperlinked terms and conditions, the legibility of the website, and the express "mechanism for manifesting assent" (i.e., clicking a submit button), the Court of Appeals reasoned that the terms and conditions were "reasonably conspicuous." *Id.* The same is true here.

As Plaintiff points out, courts applying Texas law routinely enforce sign-in-wrap agreements where the website's structure mimics Defendants; obviously hyperlinked terms and conditions and a legible website often yields, at minimum, constructive notice. *See, e.g.*, *Phillips*, 2019 WL 4861435, at *1, *4–5; *McKimmy v. OpenSea*, No. 4:22-CV-00545, 2023 WL 6370907, at *3 (S.D. Tex. Mar. 22, 2023) (applying Texas law and enforcing arbitration provision of electronic agreement under similar circumstances); *May v. Expedia, Inc.*, No. A-16-CV-1211-RP, 2018 WL 4343445, at *3 (W.D. Tex. July 19, 2018), *report and recommendation adopted*, No. 1:16-CV-1211-RP, 2018 WL 4343427 (W.D. Tex. Aug. 27, 2018) (collecting similar cases). That is also true with similar iterations of Experian's sign-in-wrap agreement. *See, e.g.*, *Martinez v. Experian Info. Sols., Inc.*, No. 3:24-CV-0744-X, 2024 WL 3906775, at *2 (N.D. Tex. Aug. 22, 2024).

Plaintiff genuinely may not have understood the consequences of creating his CreditWorks account. But that does not mean he did not enter a valid contract. Plaintiff's argument ignores that "[t]he determination of a meeting of the minds, and thus offer and acceptance, is based on the objective standard of what the parties said and did and not on their subjective state of mind." *Copeland v. Alsobrook*, 3 S.W.3d 598, 604 (Tex. App.—San Antonio 1999, pet. denied); *see also Maverick Int'l, Ltd. v. Performance Contractors, Inc.*, No. 1:22-CV-559-CLS, 2024 WL 5446743 (E.D. Tex. Nov. 20, 2024). Texas contract law pays no mind to Plaintiff's subjective knowledge. It is irrelevant. What matters is if a reasonably prudent person would have known that they were bound

15

by the Terms of Use and, consequently, the Arbitration Provision by clicking the "Create Your Account" button. As the Court has addressed, one would. Because the parties shared a meeting of the minds, and because the Terms of Use include an arbitration provision, the Court concludes that the parties entered into an arbitration agreement. *See Kubala*, 830 F.3d at 201.

## II.    Non-Signatory Enforcement

There is a second question that the Court must decide which is ancillary to the threshold question of whether an arbitration agreement exists among the parties. That is, whether Defendant ESI may enforce the Arbitration Provision, though it is a not signatory. Defendant's Motion asserts that it may because the plain language of the Terms of Use unambiguously binds all Experian affiliates—a class of which ESI is a member (Dkt. #13 at pp. 11–14). Plaintiff appears to disagree, though only by making a passing remark. Seemingly, to Plaintiff, because Defendant is not a signatory to the contract, it cannot compel arbitration of Plaintiff's claims (*See* Dkt. #16 at p. 5).

Once more, because arbitration is a creature of contract, "[w]ho is actually bound by an arbitration agreement is a function of the intent of the parties, as expressed in the terms of the agreement." *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 355 (5th Cir. 2003) (citing *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000)). Courts in the Fifth Circuit have consistently held that a non-signatory may compel plaintiffs to arbitrate under an arbitration agreement if the plaintiff agreed to arbitrate claims against the signatory and its affiliates, and it is undisputed that the non-signatory is an affiliate. *Green v. Serv. Corp. Int'l*, 333 F. App'x 9 (5th Cir. 2009); *see also Roberson v. Experian Info. Sols., Inc.*, No. SA-21-CV-00316-JKP, 2022 WL 62270 (W.D. Tex. Jan. 5, 2022) (citing *Sherer v. Green Tree Servicing LLC*, 548 F.3d 379 (5th Cir. 2008)). This case should fall in line with that pattern.

Here, Plaintiff agreed to arbitrate disputes with ECS (Dkt. #13-1 at pp. 16–20). The Terms of Use expressly provide that, as used therein:

> The term "ECS" means ConsumerInfo.com, Inc., an Experian® company (also known as Experian Consumer Services) and referred to as "Experian" on the Websites, its predecessors in interests, successors, and assigns, *affiliates (including, but not limited to, Experian Information Solutions, Inc.)*, agents, employees, and any of its third party service provides (including, without limitation, cloud service providers) who ECS uses in connection with the provision of the Services to you.

(Dkt. #13-1 at p. 10) (emphasis added). The Arbitration Provision incorporates the same definition (*See* Dkt. #13-1 at p. 17). Not only does the Arbitration Provision in the Terms of Use that Plaintiff accepted classify Defendant as an affiliate, but Defendant's uncontroverted Declaration states that Defendant is an affiliate of ECS (Dkt. #13-1 at p. 4). Plaintiff does not appear to dispute that in any way (*See* Dkt. #16). Even if it did, its attempt to do so would not be persuasive. Arbitration is a creature of contract, and the text of the contract binds ECS affiliates. And under the text of the Arbitration Provision and the Terms of Use, Defendant is one (*See* Dkt. #13-1 at p. 10). Thus, Defendant may seek to compel arbitration under the Terms of Use, as many courts have held in similar circumstances. *See Roberson*, 2022 WL 62270, at *3–4; *Meeks v. Experian Info. Servs., Inc.*, No. 21-17023, 2022 WL 17958634, at *2 (9th Cir. Dec. 27, 2022) (concluding that ESI was an affiliate of ECS such that they may enforce an arbitration agreement); *Capps v. JPMorgan Chase Bank, N.A.*, No. 2:22-CV-00806-DAD-JDP, 2023 WL 3030990, at *5 (E.D. Cal. Apr. 21, 2023) (applying the same reasoning to an analogous ECS Arbitration Provision that ESI sought to enforce and concluding ESI was an ECS affiliate); *see also Levy v. Credit Plus, Inc.*, No. 21-CV-5541 (KMK), 2023 WL 2644352, at *6 (S.D.N.Y. Mar. 27, 2023) (holding that the same evidence is sufficient to establish that Experian was an affiliate of ECS and a party to the contract); *Alvarez v. Experian Info. Sols., Inc.*, 661 F. Supp. 3d 18, 25 (E.D.N.Y. 2023), *aff'd*, No. 19-CV-3343 (JS)(JMW), 2024 WL

3643269 (E.D.N.Y. Aug. 2, 2024) (same); *McGuire v. CarMax Bus. Servs. LLC*, No. 1:23-CV-02938-NYW-SBP, 2024 WL 3897073, at *17 (D. Colo. Aug. 16, 2024), *report and recommendation adopted*, No. 23-CV-02938-NYW-SBP, 2024 WL 4027964 (D. Colo. Sept. 3, 2024). Plaintiff provides the Court with no reason at all to deviate from that well-reasoned pattern. Because the language of the Terms of Use and the Arbitration Provision unequivocally include Defendant, Defendant is a party to the Arbitration Provision that may compel arbitration under it.

## III.    Arbitrability

Having determined that the parties entered into an arbitration agreement, and having decided that Defendant may seek to enforce that agreement, the Court turns the final dispute. That is, whether Plaintiff's FCRA claims fall within the Arbitration Provision's scope. The Court cannot answer that question—it is for the arbitrator to decide. That is because the Arbitration Provision contains a delegation clause, which eliminates the Court's role in deciding questions of arbitrability. *See Henry Schein*, 586 U.S. at 69 ("[I]f [an arbitration] agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue.").

Indeed, the Supreme Court "has consistently held that parties may delegate threshold arbitrability questions to the arbitrator, so long as the parties' agreement does so by 'clear and unmistakable' evidence." *Id.* (quoting *First Options*, 514 U.S. at 944). So has the Fifth Circuit. *See, e.g.*, *Arnold v. HomeAway, Inc.*, 890 F.3d 546, 551 (5th Cir. 2018) (citing *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 69 (2010)) ("Under the FAA, parties are free to delegate questions to an arbitrator, including questions regarding validity and scope of the arbitration provision itself."). And "if the parties have clearly and unmistakably agreed to arbitrate arbitrability, certain threshold questions—such as whether a particular claim is subject to arbitration—are for the arbitrator, and

not a court, to decide." *Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 262 (5th Cir. 2014). That is precisely what happened here.

In support of his argument to the contrary, Plaintiff argues that the Arbitration Provision exclusively covers "disputes related to CreditWorks services, and Experian's involvement in [Plaintiff's] FCRA claim does not fall within its scope" (Dkt. #16 at p. 5).[4] That argument erroneous but it is based on the language of the Arbitration Provision, which does control. Defendant disagrees, arguing instead that the Court cannot decide matters of arbitrability given the existence of a delegation clause, which Plaintiff does not challenge (Dkt. #13 at p. 16; *see* Dkt. #16; Dkt. #18 at p. 1). Indeed, in relevant part, the Arbitration Provision's contains the following clause, which states that:

> All issues are for the arbitrator to decide including, but not limited to, (i) all issues regarding arbitrability, (ii) the scope and enforceability of this arbitration provision as well as the Agreement's other terms and conditions, (iii) whether you or ECS, through litigation conduct or otherwise, waived the right to arbitrate, (iv) whether all or any part of this arbitration provision or Agreement is unenforceable, void or voidable including but not limited to on grounds of unconscionability . . . .

(the "Delegation Clause") (Dkt. #13-1 at p. 19). Once more, Defendant is correct.

As one district court in the Eastern District of Pennsylvania decided when confronted with and Experian arbitration agreement including the same language, such verbiage "constitutes a 'clear and unmistakable' delegation clause under *Henry Shein*." *Coulter v. Experian Info. Sols., Inc.*, No. CV 20-1814, 2021 WL 735726, at *4 (E.D. Pa. Feb. 25, 2021). The same is true here. Given this clear, unmistakable language, the Court concludes that an arbitrator must decide whether

---

[4] Plaintiff also argues that the language of the Arbitration Provision excludes Plaintiff's claim because the Arbitration Provision "prohibits lawsuits in courts of general jurisdiction" and federal courts are courts of limited jurisdiction (Dkt. #16 at p. 6) (cleaned up). Because the Delegation Clause puts the question of arbitrability out of the Court's reach, this argument is equally as unpersuasive.

Plaintiff's claims fall within the scope of the Arbitration Provision. Other federal courts have reached the same conclusion when faced with similar language in analogous litigation involving Defendant. *See, e.g.*, *Yates v. Experian Info. Sols., Inc.*, No. 3:22-CV-00143, 2023 WL 4747386, at *2 (S.D. Tex. July 25, 2023), *report and recommendation adopted*, No. 3:22-CV-00143, 2023 WL 5279467 (S.D. Tex. Aug. 16, 2023).

What's more, the Arbitration Provision here notes that the arbitration "will be governed by the Commercial Dispute Resolution Procedures and the Supplementary Procedures for Consumer Related Disputes (collectively, "AAA Rules") of the American Arbitration Association ("AAA") as modified by this Agreement and will be administered by the AAA" (Dkt. #13-1 at p. 18; Dkt. #13-1 at p. 69). The Arbitration Provision's "express adoption of the AAA rules presents clear and unmistakable evidence that the parties agreed to arbitrate arbitrability," too. *See Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.,* 687 F.3d 671, 675 (5th Cir. 2012); *see also Yates*, 2023 WL 4747386, at *2. Thus, whether Plaintiff's claims fall outside the scope of the Agreement must be resolved in arbitration. *See Kubala*, 830 F.3d at 201.

Plaintiff's final effort to resist arbitration is his argument that he will suffer prejudice if the Court grants Defendant's Motion to Compel. But prejudice plays no part in the Court's analytical framework here. *See Kubala*, 830 F.3d at 201. That argument is irrelevant. Plaintiff's objection to arbitration on that ground is, accordingly, overruled.

\*    \*    \*

Because a valid arbitration agreement exists among the parties, Defendant's Motion to Compel should be granted. Because the Arbitration Provision reserves questions of arbitrability for the arbitrator, the Court declines to address Plaintiff's argument that his claims fall outside of the

Arbitration Provision's scope. Given that arbitration is appropriate, the Court will stay this lawsuit pending arbitration. *See* 9 U.S.C. § 3. Finally, because the Court has decided Defendant's Motion to Compel, the Court need not address Defendant's Motion to Stay (Dkt. #14). That issue is moot.

## CONCLUSION

It is therefore **ORDERED** that Defendant's Motion to Compel Arbitration and Memorandum of Law (Dkt. #13) is hereby **GRANTED**. It is further **ORDERED** that this civil action is **STAYED** until the resolution of arbitration proceedings. It is finally **ORDERED** that Defendant's Motion for a Stay of Discovery (Dkt. #14) should be **DENIED as moot**.

    **IT IS SO ORDERED**.

    **SIGNED this 3rd day of July, 2025.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE

21